UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:08-cr-51 |
| v. | ) | |
| | ) | |
| MICHAEL KELLEY | ) | JORDAN / LEE |

## REPORT AND RECOMMENDATION

### I.    Introduction

Defendant Michael Kelley[1] filed a motion to suppress evidence seized from his automobile [Doc. 128]. The Government filed an objection to the motion [Doc. 149]. The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 200]. An evidentiary hearing on the motion was held October 7, 2008. The parties filed pre- and post-hearing memoranda addressing the issues raised in the motion and hearing [Doc.128-2, 149, 202 & 204], which have been carefully reviewed and fully considered. In summary, I find no constitutional violation with respect to the stop, detention, and search of Defendant's automobile or the seizure or cash. Thus, for the reasons set forth herein, I **RECOMMEND** that Defendant's motion to suppress evidence seized from his automobile be **DENIED**.

### II.    Evidence

At the evidentiary hearing, the United States offered the testimony of Chattanooga Police Department and DEA Task Force Officer James Hixson ("Hixson") and Hamilton County Sheriff's Deputies Henry Ritter ("Ritter") and Michael Thompson ("Thompson").

---

[1] Defendant's surname appears in the record as both "Kelley" and "Kelly." As his surname is spelled "Kelley" in the Superceding Indictment, the Court will use that spelling herein.

## A.    Officer Hixson's Testimony

Hixson testified as follows: Hixson briefly described his experience as a Chattanooga Police Department officer and DEA Task Force agent. Beginning in 2007, officers from various law enforcement agencies conducted an extensive investigation into an alleged large-scale conspiracy to distribute illegal drugs. Included in the investigation were several wiretaps, including a wiretap or wiretaps on Defendant's communications. During the course of the intercepts and surveillance, officers obtained information allegedly showing Defendant's participation in the conspiracy by transporting money and cocaine between Chattanooga and Atlanta. After the arrest of another person, Defendant's activities in the transportation of the money and drugs increased.

Based on information obtained from various intercepts, Hixson and other officers learned on March 1, 2008, that Defendant would be carrying a large sum of money on March 5, 2008, from Chattanooga to Atlanta for the purchase of cocaine. Based on intercepts, officers learned a meeting would take place on March 5, 2008, at Defendant's residence where he would obtain cash for the purchase of cocaine in Atlanta. On March 5, 2008, Hixson and other officers conducted surveillance at Defendant's home and observed visits from another target of the investigation. The target, who carried a bag into Defendant's residence, was the person identified by law enforcement as responsible for bringing cash to the Defendant for his trip to Atlanta to purchase cocaine. A short time later, Hixson observed Defendant drive away from his residence with a different bag. Intercepts indicated Defendant possessed $69,500.00 for the purchase of cocaine and the line sheets for the intercepts were admitted into evidence.

Based on prior surveillance, Hixson had anticipated Defendant would travel to Atlanta by first traveling southbound on Highway 153 once he obtained the cash for the cocaine purchase. Therefore, he had made arraignments for Ritter and Thompson, canine handlers/patrol officers, to

be located on southbound Highway 153 in anticipation they might be able to observe a traffic violation by Defendant. The officers engaged in surveillance at the residence communicated with the Hamilton County Sheriff's Department about possibly stopping Defendant's vehicle. Hixson's instructions were to stop Defendant and seize the money if possible. Hixson also communicated his preference that Defendant be stopped only if he committed a traffic violation because Hixson did not want the existence of the secret wiretaps disclosed. In order to protect the existence of the wiretaps, Hixson communicated that if Ritter and Thompson could not make a stop for a traffic violation, it would not matter because, based on surveillance and intercepts, Hixson believed Defendant would engage in other trips to transport money and drugs, which would provide other opportunities for a stop. Hixson testified that Ritter knew the officers had "enough" for a stop without the traffic infraction, but also knew Hixson's preference for a traffic infraction stop.

Ritter and Thompson are not members of the DEA Task Force, but they were involved in the cocaine investigation prior to the day of the stop. Hixson spoke to their supervisor, Lieutenant Hinton ("Hinton"), about the possible traffic stop on Highway 153. Hixson and Hinton observed the stop from a nearby location and listened to the communications about the stop. In addition, Ritter spoke with Hinton via the radio during the stop.[2]

### B.     Officer Ritter's Testimony

Ritter testified as follows: Ritter briefly described his experience as a deputy with the Hamilton County Sheriff's Department. Currently, Ritter is a uniformed patrol officer and canine handler.

On March 5, 2008 Ritter was instructed by Sargent Duane Hill ("Hill") to be on southbound

---

[2] These radio communications, which may have been on a narcotics investigation channel, apparently were not recorded and cannot be heard on the audio portion of the traffic stop.

153 in anticipation of a possible traffic stop. Ritter, without his canine, and Thompson, with his canine, were located on the side of the highway in separate patrol cars. Ritter and Thompson were aware of information from the wiretaps about the movement of drugs and money between Atlanta and Chattanooga as they had monitored calls from the wiretaps in the past. Ritter understood he was to stop the Defendant's vehicle if there was a legal reason to stop it such as a traffic infraction, but that he should not stop the vehicle otherwise.

Ritter had radio contact with the several officers involved in the surveillance, including Hixson, Hill and Hinton on March 5, 2008. Between 5:00 and 5:30 p.m on the day at issue, Ritter received information about the make/model of Defendant's vehicle and that he had "possible contraband" in his vehicle. Around 5:30 p.m., Defendant's vehicle passed the location where the officers were sitting in their patrol cars on the side of Highway 153.

Upon making visual contact, Ritter observed Defendant operating his vehicle, a small, black Lexus sports car, and determined the Lexus was following another vehicle too closely in violation of Tennessee law. Ritter said the Lexus was traveling "very close" to a minivan – within three-to-five feet. He determined that distance was unsafe at the vehicles' speed, which was between 50 and 55 mph. He is trained that a car should not follow closer than ten feet for every ten mph of travel, and he also uses a four second rule for safely as well. Ritter testified that Defendant's driving violated either test for following too closely and that Defendant would not have been able to avoid an accident if the minivan had slammed on its brakes. On cross examination, Ritter conceded there were many cars at any given time on the highway that follow too closely.

Ritter initiated a traffic stop for the traffic infraction of following too closely. His onboard camera activated when he activated his patrol car's blue lights. The DVD of the stop was presented as an exhibit and viewed by the undersigned. As testified to by Ritter, the DVD does not show the

minivan. Ritter explained the camera was not activated at the time he observed the traffic violation.

Ritter approached Defendant' vehicle and explained to Defendant that he was stopped for following too closely. The DVD reflects that Defendant said he did not see a van and that he was on his way to Sam's Club to buy supplies for his restaurant. Upon Ritter's request, Defendant provided his driver's license and proof of insurance. Defendant did not have any registration paperwork. Ritter observed Defendant as having shaky hands and being nervous. Ritter told Defendant that so long as his license was valid, he probably would only receive a warning citation for the traffic infraction of following too closely. Despite being told this, Defendant appeared to Ritter to remain nervous and his hands continued to shake. Ritter returned to his patrol car to run a computer check for warrants.[3] There was a "hit" or "flag" for a city warrant, but the warrant information was reported as not verified. Ritter called Thompson on the radio for backup as he was doing the computer check.

Ritter asked Defendant to exit the vehicle while he completed the warning citation. Ritter asked if Defendant had any guns, knives, drugs, bombs, or large sums of money in the vehicle. In response, Defendant looked down or averted his eyes to avoid eye contact and replied "no." Ritter described this as a "red flag" based upon his training and experience. Ritter then asked for permission to search the vehicle, and Defendant refused to consent saying there was no probable cause for a search. Ritter said he asked for permission to search based on the unverified warrant "hit," Defendant's nervousness, Defendant's avoidance of eye contact, the information he received

---

[3] When Ritter returned to his patrol car, he comments that Defendant is "nervous as hell" and then the audio portion of the recording cuts off until he has Defendant move to the front of the patrol car. The placement of the Defendant blocks a significant portion of the remaining aspects of the DVD and the audio is cut off during much of the remaining portion of the DVD. In an ideal situation, law enforcement would not turn off the audio and/or block the camera by allowing a motorist to stand in front of the camera.

that Defendant was leaving for Atlanta with a bag with possible contraband, and the information he knew from the wiretaps about the cocaine conspiracy. Ritter did not know what contraband might be in the bag. When Defendant refused consent, Ritter told him he would have a dog deployed on the car and would search without Defendant's permission if there was an alert by the dog.

While Ritter was still in the process of finalizing the warning citation, he asked Thompson to deploy his drug-detection canine, Yasco, because consent to search was refused. Thompson deployed Yasco within a few minutes of Defendant's refusal to give consent. Ritter testified that if Yasco had not alerted, then he intended to release Defendant with the warning citation without searching Defendant's vehicle.

As a trained canine officer, Ritter recognized an alert by Yasco on Defendant's automobile at the seam where the driver's door meets the front fender. Yasco did not alert at the trunk of the vehicle. Ritter thinks the airflow from the trunk could result in an alert at the front fender and he said the sniff was discontinued upon the alert, because Yasco alerts by scratching and biting the vehicle, which causes damage. A photograph of the scratches where Yasco alerted was entered as an exhibit. Ritter is familiar with Yasco's aggressive biting/scratching alert because he and his drug-detection dog train with Thompson and Yasco eight hours a week.

Ritter told Defendant there was an alert on the Lexus and then conducted a pat-down search of Defendant for the sake of officer's safety. Ritter felt a bulge in Defendant's pocket and asked Defendant about the bulge. Defendant said he had money in his pocket and was on his way to Sam's Club to purchase supplies for his business. Defendant had some $1570.00 in cash on his person.

The officers then began a search of Defendant's vehicle. After finding nothing in the interior of the vehicle, they opened the trunk where they located a bag containing three one-gallon plastic bags full of money and clothes. When asked, Defendant said there was $69,500.00 in the bags and

indicated the money was for business-related purchases at Sam's Club.

Ritter seized the money and released Defendant after telling him he could obtain a return of the money if he proved it was legitimate. According to Defendant's Exhibit 1 – the Report of Investigation by Hixson – Defendant was released by 6:00 p.m., or approximately 30 minutes after the stop was initiated. Shortly thereafter, Ritter swabbed the money to determine the presence of narcotics and was told the money on Defendant's person and in his trunk was positive for traces of cocaine.

### C.      Officer Thompson's Testimony

Thompson described his 14 years of experience as a deputy and his last two years as a canine handler of Yasco. On March 5, 2008, he was in his patrol car with Yasco on Highway 153 with Ritter in a separate car. Ritter said he was leaving to follow a car because he observed a violation. Thompson remained in place. After not hearing from Ritter for a few minutes, Thompson followed in the direction of Ritter's patrol car as a matter of course. Thompson did not receive a call from Ritter requesting backup. When he arrived at the scene of the stop at issue, Thompson observed Ritter speaking with the Defendant and heard Ritter ask for consent to search. When Defendant refused, Ritter asked Thompson to deploy Yasco. Thompson then retrieved Yasco from his patrol car and deployed him at Defendant's car. Once Yasco alerted on Defendant's vehicle, Thompson returned Yasco to the patrol car.

Thompson detailed his and Yasco's training and certification. Both were certified by the Rudy Drexler School at the time of the search at issue. Thompson said Yasco was an amazing drug-detection dog with 100 percent reliability in training.

III.    **Findings of Fact**

I **FIND** the testimony of Hixson, Ritter, and Thompson was not controverted by the evidence. Defendant's arguments concerning credibility of these witnesses also fails and their credibility was not impeached. While there are minor inconsistencies in the witnesses' testimony, such as whether Thompson was called to the scene of the stop as back-up or followed on his own accord, such inconsistences are understandable given the passage of time and relative insignificance of the details where the inconsistencies occurred. Therefore, I **FIND** the uncontroverted testimony of these witnesses provides an accurate description of the relevant events at issue and constitutes the facts of this matter.

IV.    **Analysis**

Defendant seeks suppression of the evidence resulting from the stop of his automobile on the following grounds: (1) the stop of the automobile was pretextual; (2) there was no probable cause to question Defendant during the stop; (3) there was no probable cause to search the automobile during the stop; (4) there was no basis for the seizure of the money from the automobile under the reasoning of *Cuellar v. United States*, 128 S. Ct. 1994 (2008), and (5) the warrantless search and seizure violated the Fourth Amendment [Doc. 128].

Defendant's motion involves a non-consensual, investigative detention. *See United States v. Avery*, 137 F.3d 343, 352 (6th Cir.1997). Given the issues raised in Defendant's motion, the initial stop of the automobile, the detention of its occupant, and the subsequent search of the vehicle are all acts which must be separately considered. *See United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994).

A.    **Legitimate Expectation of Privacy**

As a preliminary matter, Defendant has the burden of establishing a legitimate expectation

of privacy to assert a Fourth Amendment right. *See United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). Defendant may challenge the admission of illegally obtained evidence only if his own constitutional rights have been violated. *See Rakas v. Illinois*, 439 U.S. 128, 134 (1978). "Fourth Amendment rights are personal [and] may not be vicariously asserted." *United States v. Myers*, 102 F.3d 227, 231 (6th Cir. 1996) (quoting *Rakas*, 439 U.S. at 134). In the instant matter, it appears undisputed that Defendant had a legitimate expectation of privacy with respect to all contested issues.

**B.    The Stop**

Defendant argues no legal basis existed for the stop at its inception. The United States Court of Appeals for the Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Gaddis v. Redford Twp.,* 364 F.3d 763, 771 n.6 (6th Cir. 2004)); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) (the decision to stop an automobile is reasonable where there is probable cause to believe a traffic violation has occurred); *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (same); *see also United States v. Simpson*, 520 F.3d. 531, 538 (6th Cir. 2008) (reasonable suspicion standard for ongoing traffic violation; probable cause standard for completed traffic violation).[4]

Defendant argues that there was no probable cause to believe a traffic violation occurred and/or that there was selective enforcement as most cars traveling the highway were following at

---

[4] Whether the police may stop a vehicle based on mere reasonable suspicion of a civil traffic violation is the subject of a conflict in the case law, *see Blair*, 524 F.3d at 748, n.2; *Simpson*, 520 F.3d. at 538, but that issue is not raised here because the Government argues Ritter had probable cause to stop the Defendant based on the civil traffic violation of following too closely.

least as closely as Defendant was alleged to have been following the minivan. Defendant makes this argument without presenting any proof that he was *not* following too closely. While he appears to seek support from the fact that the DVD does not show a minivan or that Defendant's vehicle was following any car more closely than other vehicles on the highway, these arguments do not contradict Ritter's testimony. The DVD was not activated at the time the infraction was observed because the DVD was activated when Ritter turned on the patrol car's blue lights. Ritter testified he observed Defendant following another vehicle too closely and none of the minor inconsistencies in the witnesses' testimony indicated Ritter fabricated that Defendant was following too closely as a justification for the stop. To the contrary, Ritter understood he should look for a violation, but *not* stop the car *unless* he saw an infraction since there would be future opportunities for a stop. The credible and undisputed testimony of Ritter established that Defendant was observed following too closely in violation of the applicable Tennessee traffic law, T.C.A. § 55-8-124.[5]

A court must evaluate the proffered basis for a stop against the standard of whether it was objectively reasonable, given the totality of the circumstances. In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court made clear that a determination of probable cause involves the exercise of a "practical, common-sense judgment." 462 U.S. at 244. Describing the perspective from which a reviewing court should evaluate a law enforcement officer's determination of probable cause when making a traffic stop, the Sixth Circuit has held "all probable cause determinations [are] fact-dependent and will turn on what the officer knew *at the time he made the stop*." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis in original).

Probable cause is a reasonable ground for belief supported by less than *prima facie* proof but

---

[5] Under T.C.A. § 55-8-124, a vehicle is following too closely if the driver follows a vehicle "more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon the and the conditions of the highway."

more than mere suspicion. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 2436 (2007). The police may lawfully detain a vehicle and conduct a brief stop of its occupants where there is probable cause to believe a traffic violation has occurred, even if the traffic offense is minor and the officer had additional subjective reasons for making the stop. *Whren*, 517 U.S. at 810, 813; *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003). That Defendant was stopped for the infraction – while others were not – does not dispute that Defendant was, in fact, following too closely.

As to Defendant's suggestion that the stated reasons for the stop were mere pretext designed to obscure that the Defendant was impermissibly stopped on a hunch he had contraband in his vehicle, the Supreme Court has held a law enforcement officer's actual motives or subjective intent are irrelevant in determining whether a traffic stop is proper. *Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *Ferguson*, 8 F.3d at 391. The subjective intent of an officer in stopping a vehicle simply has little to no relevance as long as the necessary probable cause exists. *Blair*, 524 F.3d at 748. Thus, pursuant to cases such as *Whren* and *Ferguson*, the fact that it appears Ritter had an investigatory agenda at the time of the stop is irrelevant for purposes of suppression. Under the current status of applicable precedents, it simply does not matter that law enforcement was purposefully looking for a reason to lawfully stop Defendant – and he provided that reason by committing a civil traffic infraction. *See Ferguson*, 8 F.3d at 391 (it is irrelevant what else officer knew or suspected about the traffic violator at the time of the stop); *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002) (stop valid despite officer's testimony indicating initial traffic stop was pretextual). Defendant has not cited to any authority that

would support a contrary conclusion.

Accordingly, I **FIND** the Government has shown probable cause to believe a civil traffic violation occurred to support the stop. Given the strong proof that Ritter observed a traffic infraction, it is not necessary to address whether Ritter also had, in the absence of a traffic infraction, "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)), to support the stop, with or without application of the collective knowledge doctrine.

### C. The Detention

Finding a traffic stop justified and valid at its inception does not end the Fourth Amendment inquiry because any detention of the Defendant must be reasonable. Defendant appears to argue that, notwithstanding whether the original basis for the stop was valid, the subsequent scope of the detention was unreasonable because there was no probable cause to question the Defendant or seek his consent for a search. The Government argues the scope and questioning of Defendant was reasonable and lawful under the circumstances.

The Sixth Circuit has held "continuing to detain a motorist does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation." *Herbin*, 343 F.3d at 810. Thus, that Ritter only anticipated issuing a warning citation is of no legal significance.

When a vehicle is lawfully stopped, an officer may request a driver's license and vehicle registration from the driver. *See Berkemer v. McCarty*, 468 U.S. 420, 437 (1984); *United States v. Hill,* 195 F.3d 258, 269 (6th Cir. 1999). The occupants of a vehicle may be detained until after the officer has finished verifying the driver's license, checking other records, and issuing a citation, as these acts are within the purpose of the initial stop. *See United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999); *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996). Detention of a

suspect until the completion of records checks regarding the vehicle and driver and the issuance of a citation for a traffic violation are "well within the bounds of the initial stop." *Bradshaw*, 102 F.3d at 212.

In *United States v. Burton*, the Sixth Circuit addressed whether it was reasonable for an officer to ask someone detained during a traffic stop a few questions that were unrelated to the initial reason for the traffic stop. 334 F.3d 514, 518-19 (6th Cir. 2003). In *Burton* the officer initiated a traffic stop due to a curbside parking violation, and he spoke with the driver outside the stopped vehicle regarding his driver's license, ownership of the vehicle, and whether anything illegal was inside. *Id.* at 515. The officer then asked whether the driver would consent to a search of the vehicle, to which the driver agreed. *Id.* at 516. On review, the Sixth Circuit concluded the scope and duration of the traffic stop were reasonable because the handful of questions the officer asked the driver were not unusually intrusive and did not make the traffic stop any more coercive than a typical traffic stop. *Id.* at 518-19; *see also United States v. Ellis*, 497 F.3d 606, 613-14 (6th Cir. 2007) (questions about the occupants' itinerary, reasons for travel and identification are reasonablely related to a traffic stop and not overly intrusive); *Hill*, 195 F.3d at 268 (officer may ask questions about identity, travel plans and consent during traffic stop). Defendant's argument that he was questioned or asked for consent to search without probable cause is neither supported by the law nor persuasive.

Once the purpose of the traffic stop is completed, officers "may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *United States v. Perez*, 440 F.3d 36, 370 (6th Cir.) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995), *cert. denied*, 127 S. Ct. 542 (2006)); *Terry*, 392 U.S. at 1; *United States v. Saucedo*, 226 F.3d 782, 788 (6th Cir.

2000); *Weaver v. Shadoan*, 340 F.3d 398, 408 (6th Cir. 2003). The Sixth Circuit has held that "[u]nder the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity. *United States v. Urrieta*, 520 F.3d 569, 578 (6th Cir. 2008) (citing *United States v. Townsend*, 305 F.3d 537, 541, 545 (6th Cir. 2002)). Thus, in order to detain the Defendant beyond the purpose of the original traffic violation, *i.e.*, to issue a ticket for following too closely, Ritter must have had a reasonable suspicion criminal activity was afoot. Otherwise, any continued detention would constitute an illegal seizure of Defendant. *See Terry*, 392 U.S. at 18.

Reasonable suspicion is more than a hunch but "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (citing *Sokolow*, 490 U.S. at 7). Reasonable suspicion must be supported by specific articulable facts. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998). "[A] policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *McCarty*, 468 U.S. at 439 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). Based upon the totality of the circumstances, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Under such circumstances, the suspect may be briefly detained to investigate the suspicious circumstances. *Id.*

In *United States v. Sharpe,* 470 U.S. 675, 686 (1985), the Supreme Court held that in assessing whether a detention is too long in duration to be justified as an investigative stop, it is proper to examine whether the police diligently pursued a means of investigation likely to confirm

or dispel their suspicions quickly. Thus, the focus is on the diligence of the police and is not on the length of the detention. *United States v. Calderon-Valenzuela*, Nos. 98-4353, 98-4355, 2000 WL 571953, * 4 (6th Cir. May 3, 2000). Generally, if a detention exceeds its proper scope, then any evidence seized during the illegal detention must be suppressed as fruit of the poisonous tree. *Hill*, 195 F.3d at 264.

Ritter stated he was suspicious based on the unverified warrant "hit," Defendant's nervousness, Defendant's avoidance of eye contact, the information he received that Defendant was leaving for Atlanta with a bag containing possible contraband, and the information he knew from the wiretaps about the cocaine conspiracy. As to "nervousness," the Sixth Circuit has repeatedly held "[a]lthough nervousness may be considered as part of the overall circumstances giving rise to a reasonable suspicion, this court has found nervousness inherently *unsuspicious,* and has therefore given it very limited or no weight in the reasonable-suspicion calculation." *Urrieta*, 520 F.3d at 577 (emphasis in original) (citing *United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004); *United States v. Andrews*, 600 F.2d 563, 566 (6th Cir. 1979)). Thus, in this analysis, the nervousness of Defendant will be considered as part of the totality of the circumstances, but it will be accorded minimal significance.

Based on the DVD and the testimony, the stop was not completed until a warning citation was issued for following too closely at or shortly after the time of Yasco's alert. Even if the citation arguably could have been issued prior to the deployment of Yasco, the Government has met its burden to show, by a preponderance of the evidence, the existence of a reasonable suspicion to believe – based upon objective and articulable facts – that the Defendant was engaged in criminal activity. The officer's observations and information led him to reasonably suspect that Defendant had committed, was committing, or was about to commit a crime. Thus, he was justified in his

decision to very briefly detain Defendant in order to more fully investigate the circumstances that provoked his suspicion by having the on-scene canine deployed at Defendant's car.

Given the totality of the circumstances, there was ample reasonable suspicion to detain Defendant for the canine deployment even if the warning citation was, or could have been, completed moments prior to the dog deployment, and the deployment did not unreasonably extend the traffic stop. Therefore, and as addressed below with respect to Yasco's reliability, it is not necessary to address the Government's argument that there was probable cause for the search in the absence of an alert, especially since Ritter testified he would *not* have conducted a search in the absence of consent or an alert (in order to maintain the secrecy of the wiretaps as instructed). While the facts listed above such as nervousness, standing alone, do not necessarily create reasonable suspicion, in combination the facts generated reasonable suspicion to justify further detention and expansion of the original scope of the traffic stop.[6]

Both the Supreme Court and the Sixth Circuit have repeatedly recognized a dog sniff conducted during a lawful stop that reveals no information other than the location of contraband does not violate the Fourth Amendment. *See e.g., City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *United States v. Place*, 462 U.S. 696, 707 (1983); *Davis*, 430 F.3d at 355. The Supreme Court has also held the use of a drug-sniffing dog that does not extend the length of a legitimate traffic stop does not violate the Fourth Amendment even where there are no specific and articulable facts to suggest drug activity. *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005). When officers reasonably suspect the occupant of a vehicle of illegal drug trafficking, as in the instant case, a

---

[6] There is no evidence the stop was completed at the time of the deployment since Ritter testified he was in the process of finalizing the warning citation at the time of the deployment. However, even if the citation could have been issued sooner (thus completing the purpose of the stop), the scope and duration of the detention were reasonable in this case given the totality of the circumstances.

"canine narcotics sniff is directly related to investigating this suspicion." *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). In the instant matter, the officers exhibited diligence and did not unreasonably extend the detention of Defendant. *See, e.g., United States v. Avery*, 137 F.3d 343, 350-51 (6th Cir. 1997) (holding twenty-five minute delay during investigatory stop was reasonable); *United States v. Knox*, 839 F.2d 285, 290-91 (6th Cir. 1988) (holding thirty minute delay during investigatory stop was reasonable*); Garcia*, 496 F.3d at 504 ("the duration of the stop was reasonable; the canine sniff was performed within a half hour of the stop"); *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (police had reasonable suspicion to detain suspect for thirty to forty-five minutes to wait for the first drug-detection dog to arrive); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (detention reasonable where investigation lasted less than one hour with some 35 minutes spent waiting for the canine unit to arrive).

Accordingly, I **FIND** the United States has met its burden of showing the scope and length of the detention were reasonable given the totality of the circumstances and did not violate the Defendant's Fourth Amendment rights.

### D.    Search

Defendant's pleadings seems to claim that Yasco did not actually alert to his vehicle [Doc. 128-2]. The uncontroverted evidence is to the contrary. At the hearing, Defendant appeared to argue that because the alert was at the front fender area of the vehicle, and not at the trunk, the alert did not provide a basis for a search of the trunk or the bag in the trunk. Defendant was invited to submit authority, if any, to the Court in support of such an argument, but has failed to do so.[7] "[I[f probable cause justifies the search of the lawfully stopped vehicle, it justifies the search of every part

---

[7] Such an argument also ignores the undisputed testimony about the airflow pattern from the trunk to the front of Defendant's vehicle and the deployment process with Yasco, who has an aggressive and car-damaging scratching/biting alert.

of the vehicle and the contents that may conceal the object of the search." *United States v. Burnett*, 791 F.2d 64, 67 (6th Cir.1986) (citing *United States v. Ross*, 456 U.S. 798, 825 (1982)). *See also United States v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991) (If there is probable cause to search a lawfully stopped vehicle, "then that probable cause extends to justify the search of every part of the vehicle and all containers found therein in which contraband could be hidden.").

Although searches must normally be conducted pursuant to a warrant, under the well-known automobile exception, a warrantless search of a vehicle that has been stopped lawfully is permissible if the search is based upon probable cause. *United States v. Ross*, 456 U.S. 798, 823 (1982); *United States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir. 1994). The Government argues the canine alert provided the necessary probable cause for the search of the vehicle, while Defendant appears to contend the alert was insufficient to provide probable cause because the canine may not have been reliable.

The key components of canine detection are the communication by the dog of the detection of a targeted scent and the recognition of the dog's handler that the scent has been detected. *United States v. Howard*, 448 F. Supp. 2d 889, 899 (E.D. Tenn. 2006). This is what is commonly referred to as an "alert." For a "dog's alert to be admitted on the issue of probable cause, all that is required is evidence the dog is generally certified as a drug-detection dog." *Id.* at 895. "It is well established in [the Sixth] Circuit that an alert by a properly trained and reliable dog establishes probable cause sufficient to justify the warrantless search of a stopped vehicle." *Hill*, 195 F.3d at 273. It is equally well established in the Sixth Circuit that certification of a drug detection dog is *prima facie* proof of the dog's credibility, which may then be rebutted by evidence regarding the dog's performance or training. *See e.g.,United States v. Diaz*, 25 F.3d 392, 394-95 (6th Cir. 1994); *Howard*, 448 F. Supp. 2d at 897-98. Thus, two issues remain: (1) whether the Government has established the

canine alerted, and (2) whether the Government has established the canine was properly trained and reliable.

The undisputed testimony of both Ritter and Thompson is that a valid alert occurred at the Defendant's automobile providing probable cause for the search. Thompson testified unequivocally that Yasco was certified, well trained, and reliable. "[T]he primary issue in determining the credibility of a dog's alert in not the capability or ability of a dog to accurately identify particular scents, but is instead the communication between the handler and the dog based on that indisputable ability." *Howard*, 448 F. Supp. at 897-98. Thus,

> [t]he fundamental determination in evaluating the training and reliability of a drug-detection dog is the credibility of the handler's testimony. Because the handler is the only witness who can speak to the subjective interaction during a particular dog alert, it is necessary to defer to his testimony if it is found to be credible.

*Id.* at 899-90.

Thompson's credible and undisputed testimony, as an experienced and trained canine handler, was that there was an alert on Defendant's vehicle by Yasco. Ritter, who is also a trained handler, likewise testified to the facts and circumstances of Yasco's alert. That drugs were not found in the searched vehicle does not indicate Yasco is unreliable. The fact drugs were not found in Defendant's vehicle does not necessarily lead to the conclusion the dog falsely alerted. *See id.* at 897. Yasco's alerts to the odor of narcotics. Given Hixson's testimony about Defendant's ongoing involvement in the transportation of drugs and money, and Thompson's testimony about Yasco's training, ability and performance, the absence of drugs is by no means fatal to a finding that Yasco is reliable. *See United States v. Torres-Ramos*, Nos. 06-3580, 06-3635, 06-3640, 06-3942, 2008 WL 3078262, * 9 (6th Cir. Aug. 7, 2008) (citing *e.g. Diaz*, 25 F.3d at 396 ) (even a low percentage of false positives is not necessarily fatal to a finding that a drug detection dog is properly

trained and certified)). Thus, Defendant's arguments with respect to Yasco's reliability fail.

I **FIND** there is sufficient evidence that Yasco is well-trained, certified, and reliable for purposes of establishing probable cause for the search. The use of a drug-detection dog is an accepted investigative technique in the Sixth Circuit and, when a properly trained and certified drug-detection dog alerts to an item, the alert alone constitutes probable cause for a search. *Diaz*, 25 F.3d at 394-95 (6th Cir. 1994); *United States v. Lattner,* 385 F.3d 947, 951 (6th Cir. 2004), *cert. denied*, 543 U.S. 1095 (2005). Thus, I **FIND** the officers, who already had suspicions concerning Defendant's involvement in criminal activity, had probable cause for the warrantless search of Defendant's automobile, including the trunk and bag where the money was located. I **FIND** the alert by Yasco formed a sufficient basis for probable cause and the subsequent search was not illegal.

### E.      Seizure

The only case mentioned in Defendant's pleadings with respect to his argument that there was no basis for the seizure of funds from his automobile and person is *Cuellar v. United States*, 128 S. Ct. 1994 (2008). In *Cuellar*, the defendant was arrested as he was driving in Texas toward Mexico with about $81,000.00 hidden in a secret compartment of his car. *Id.* at 1997-98. The defendant was convicted under 18 U.S.C. § 1956(a)(2)(B)(I), a money laundering provision that criminalized certain kinds of transportation of money derived from unlawful activity. 128 S. Ct. at 1999. The issue on appeal in *Cuellar* was whether merely hiding funds in the course of transportation was sufficient to show the transportation itself was "designed . . . to conceal" the nature of the proceeds under § 1956(a)(2). *Id.* at 1999-2000. The Supreme Court held the statute required proof that the purpose of the transportation, not merely its effect, was to conceal the nature, source, ownership and control of the funds. *Id.* at 2005. Because the purpose of the transportation

in *Cuellar* was to take money to Mexico to pay participants in a drug operation – and hiding the money was simply incidental to the transportation itself – the Supreme Court reversed the defendant's conviction. *Id.* at 2005-06. In this case, Defendant has made no effort whatsoever to show how the reasoning in *Cuellar* applies or relates to his claim that suppression is appropriate because the funds were allegedly wrongfully seized.

To the extent the Defendant is attempting to claim the money from his vehicle and person should not have been seized because there was no reason to believe the money was evidence of a crime, the argument fails. Officers reasonably believed the money seized from Defendant was evidence of a crime because they were aware from the intercepts that Defendant was on his way to deliver money to purchase cocaine. In addition, Defendant had already denied having a large sum of money in his vehicle, then given an "explanation" for the money, *i.e.*, a trip to Sam's Club. Ritter was justifiably suspicious given Defendant's initial false denial he was carrying a large sum of money and because Defendant was driving a sport's car that likely could not transport some $71,000.00 in business-related purchases.

It is unclear whether Defendant is also contesting his pat-down, which resulted in the discovery and seizure of $1570.00 from his person. Officers who stop a person who is "reasonably suspected of carrying drugs" are "entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions." *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001); *see also United States v. Garcia*, 496 F.3d 495, 505 (6th Cir. 2007) (concluding a pat-down was reasonable when the officers reasonably suspected the person of drug trafficking). On the evidence of record in this case, the officers could properly pat-down Defendant and seize the money he had on his person for the reasons set forth above. *See Heath*, 259 F.3d at 530.

## V.    Conclusion

For the reasons stated herein, I **RECOMMEND** that Defendant's motion to suppress evidence seized from the search of his automobile (and person) [Doc. 128] be **DENIED**.[8]

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[8] Any objections to this report and recommendation must be served and filed within ten days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).