UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:08-cr-51 |
| | ) | Jordan / Lee |
| MICHAEL KELLEY | ) | |
| GERALD CUNNINGHAM | ) | |
| NANETTE SHROPSHIRE | ) | |
| GUY STINER | ) | |
| PERRY LAWRENCE | ) | |

## REPORT AND RECOMMENDATION

### I.    Introduction

Defendant Perry Lawrence ("Lawrence") filed a motion to suppress all evidence obtained

as a result of the interception of wire and electronic communications ("wiretaps") stemming from

a warrant authorizing wiretaps ("wiretap warrant") issued on October 5, 2007, and all subsequent

wiretap warrants [Doc. 103].  Defendant Gerald Cunningham ("Cunningham"), Defendant Nanette

Shropshire ("Shropshire"), Defendant Guy Stiner ("Stiner"), and Defendant Michael Kelley

("Kelley")[1] moved to suppress all evidence obtained as a result of wiretap warrants issued on

Kelley's telephones on or about February 12 and 13, 2008 [Doc. 108, 116, 118 & 127].  In the

alternative, Cunningham, Shropshire, Stiner, and Kelley seek a hearing pursuant to *Franks v.*

*Delaware*, 438 U.S. 154 (1978) ("Franks hearing") [*id.*].  The motions filed by Lawrence,

Cunningham, Shropshire, Stiner, and Kelley (collectively the "Defendants"), have been referred for

---

[1]   Kelley's surname appears as both "Kelly" and "Kelley" in the record.  This report and recommendation will use the spelling contained in the Superceding Indictment, "Kelley."  Although Defendant John P. Franklin, Jr. ("Franklin") filed a motion raising issues about suppression of the wiretap evidence [Doc. 134], Franklin subsequently filed a notice of intent to plea [Doc. 189] so his motion is not addressed herein.

a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 200]. The parties have filed memoranda addressing the issues raised in the pending motions [Doc. 104, 108, 117, 118-2,144 & 159], which have been carefully reviewed and fully considered. In summary, I find no constitutional violation with respect to the issues raised in the pending motions to suppress. Thus, for the reasons set forth herein, I **RECOMMEND** that Defendants' motions to suppress be **DENIED**.

## II.    Background

### A.    The October Wiretap Application

The affiant for the October 5, 2007 application/affidavit is Detective Andy Browne ("Browne") of the Hamilton County Sheriff's Office [Doc. 157-2 at 2]. His affidavit, which is 26 pages in length, sought authorization from the state criminal court under Tenn. Code Ann. § 40-6-304 to intercept the communications of Marcus A. Lewis ("Lewis") and others occurring over telephone number (423) 580-1592, which was assigned to Tina Brown and carried and used by Lewis, concerning a conspiracy to possess, transport, and distribute cocaine in excess of 300 grams in violation of Tenn. Code Ann. § 39-17-417(j) [Doc. 157-2 at 2]. An order authorizing the interception of the relevant wire communications over the target telephone was signed by Judge Barry Steelman of the Criminal Court for the 11th Judicial District of Tennessee on October 5, 2007, the same day Browne signed the affidavit [*id.* at 27-32].

### B.    The February Wiretap Applications

Warrants were sought on February 13, 2008, for two different telephone numbers assigned to Kelley [Doc. 117-2 and 117-3]. The affiant for both affidavits is Special Agent Rodd Watters ("Watters") of the Tennessee Bureau of Investigation ("TBI") [*id.*]. The first affidavit, which is

dated February 12, 2008, and is 47 pages in length, sought authorization under Tenn. Code Ann. § 40-6-304 to intercept the communications of Kelley, Demarcus Akins ("Akins"), and others occurring over telephone number (423) 693-3797, which was assigned to Kelley, concerning a conspiracy to possess, transport, and distribute cocaine in excess of 300 grams in violation of Tenn. Code Ann. § 39-17-417(j) [Doc. 117-2 at 4]. Watters signed the affidavit on February 13, 2008 [*id.* at 50]. The affidavit is accompanied by an authorization signed by William H. Cox, III ("Cox"), the District Attorney General for the 11th Judicial District, indicating that, pursuant to Tenn. Code Ann. § 40-6-304, he reviewed the application and affidavit signed by Watters and authorized the application [*id.* at 51]. An order authorizing the interception of the relevant wire communications over telephone (423) 693-3797, was signed by Judge Steelman on February 13, 2008 [*id.* at 52-57].

The second affidavit, which is also dated February 12, 2008, and is 49 pages in length, likewise sought authorization under Tenn. Code Ann. § 40-6-304 to intercept the communications of Kelley, Akins, and others occurring over telephone number (423) 320-0827, which was assigned to Kelley, concerning a conspiracy to possess, transport, and distribute cocaine in excess of 300 grams in violation of Tenn. Code Ann. § 39-17-417(j) [Doc. 117-3 at 4]. Watters signed the affidavit on February 13, 2008 [*id.* at 51]. The affidavit is also accompanied by an authorization signed by Cox indicating he reviewed the application and affidavit signed by Watters and authorized it [*id.* at 52]. An order authorizing the interception of the relevant wire communications over telephone (423) 320-0827 was also signed by Judge Steelman on February 13, 2008 [*id.* at 52-58].

## III.    Analysis

### A.    Applicable Law

As noted, the search warrants authorizing the wiretaps in question were issued by a state

criminal court judge pursuant to Tenn. Code Ann. § 40-6-304. No defendant has explicitly argued that because the evidence at issue was obtained by a state authorized wiretap, state law must be applied in determining whether the wiretap evidence is admissible in federal court. Lawrence, however, does cite the Tennessee wiretap statute, but acknowledges that the relevant federal statute, 18 U.S.C. § 2518, is identical to the Tennessee statute [Doc. 104 at 2-3]. Cunningham asserts that the affidavit in support of the wiretap applications for Kelley's telephones does not meet the requirements for the prerequisite of "necessity" under state and federal law [Doc. 108 at 1], but he cites only the relevant federal law in his memorandum in support of his motion to suppress [*id.* at 6-7]. Shropshire also cites to Tenn. Code Ann. § 40-6-304, but cites only federal law concerning the "necessity" requirement for a wiretap in her memorandum in support of her motion to suppress [Doc. 117 at 5]. Stiner likewise cites only federal law in his memorandum [Doc. 118-2 at 2]. The Government, while noting that the Supreme Court and the Sixth Circuit Court of Appeals ("Sixth Circuit") have not addressed the issue of whether state law plays a role in the analysis when evidence from state-authorized wiretaps are sought to be used in federal court, asserts the clear weight of federal authority is that federal law controls the issue [Doc. 144 at 3].

It has long been established that federal law, not state law, applies in determining the admissibility of evidence in federal court. *See Elkins v. United States,* 364 U.S. 206, 223-24 (1960)*; Preston v. United States*, 376 U.S. 364, 366 (1964); *United States v. Bennett*, 170 F.3d 632, 635 (6th Cir. 1999). However, the inquiry does not end here because the issue is whether federal law – Title III – requires that state law, as well as federal law, apply to determine the admissibility of wiretap evidence in federal court where the wiretap was authorized by a state judicial officer. *See United States v. Williams,* 124 F.3d 411, 427-428 (3d Cir. 1997) (holding "it is a general rule that federal

4

district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law" and concluding that the court must look to the text of Title III to determine if the court should apply state law in determining the admissibility of wiretap evidence).

The Sixth Circuit has addressed the applicability of state law in determining the admissibility of evidence obtained from a wiretap authorized by a federal judge, as opposed to a state judge. *See United States v. Votteller*, 544 F.2d 1355, 1361 (6th Cir. 1976) ("Evidence lawfully obtained under federal law is admissible in federal courts even though it may possibly be a violation of state law."). While neither the Supreme Court nor the Sixth Circuit has addressed the narrower question the instant case presents, *i.e.*, whether federal law requires that state law as well as federal law apply in determining the admissibility of wiretap evidence in federal court where the wiretap was sought and authorized solely by state actors, at least one United States Court of Appeals has answered this question in the affirmative on the basis of 18 U.S.C. § 2516(2) of Title III.

Section 2516(2) states in relevant part:

> The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant *in conformity* with section 2518 of this chapter and *with the applicable State statute an order authorizing, or approving the interception of wire, oral, or electronic communications by investigative or law enforcement officers* having responsibility for the investigation of the offense as to which the application is made . . . .

(emphasis added). In *United States v. Edwards*, 69 F.3d 419, 428 (10th Cir. 1995), Oklahoma state law enforcement officers in the course of a state investigation obtained an order from a state judge authorizing a wiretap which later produced evidence the prosecutor sought to introduce into a

criminal trial against the defendants in federal court. The defendants argued the wiretap evidence was inadmissible because it violated the Oklahoma wiretapping statute. The court applied Oklahoma law to the suppression issue stating, "under the federal wiretap statute, 18 U.S.C. § 2516(2), we must defer to state law on the question of the validity of a wiretap order obtained in state court under state law." *Id.* at 428. The reviewing court upheld the district court's decision to admit the evidence on the ground that the wiretap had complied with Oklahoma law, but also commented that "[t]he provisions of the Oklahoma wiretap statute are virtually identical to the federal wiretap statute." *Id.* at 429.

On the other hand, at least five United States Courts of Appeals have held that state law does not apply in determining the admissibility of evidence derived from state-authorized wiretaps. In *United States v. Padilla-Pena*, 129 F.3d 457, 464 (8th Cir. 1997), the Eighth Circuit rejected the defendant's argument that state law applied to admissibility issues of wiretap evidence obtained by state police and authorized by a state judge. In so holding, the court stated, without elaboration or, reference to § 2516(2), that:

> Appellants also contend that the government's wiretap minimization procedures violated Neb.Rev.Stat. § 86-705(6) (Reissue 1994). Having determined that the government agents acted reasonably in their efforts to comply with the minimization requirements of 18 U.S.C. § 2158(5), we need not consider this argument. We have consistently held that evidence obtained in violation of a state law is admissible in a federal criminal trial if the evidence was obtained without violating the Constitution or federal law.

*Id.*

In *United States v. Brazel*, 102 F.3d 1120, 1154 (11th Cir. 1997), the federal government sought to introduce conversations recorded from a cordless phone and intercepted by state police during the course of their investigation. The Eleventh Circuit, with no reference to § 2516(2),

6

rejected the defendant's argument that state law applies in determining admissibility of the conversations, stating it was "well settled that federal law governs the admissibility of tape recordings in federal criminal cases, and complaints that the evidence was obtained in violation of state law are of no effect." *Id.* at 1154.

In *United States v. Miller*, 116 F.3d 641 (2d Cir. 1997), the Second Circuit dismissed as *dicta* language in previous Second Circuit cases which appeared to support the contention that state authorized wiretaps must comply with Title III and state law. *Id.* at 661. The Second Circuit noted that in *United States v. Manfredi*, 488 F.2d 588 (2d Cir. 1973), *cert. denied*, 417 U.S. 936 (1974); *United States v. Rizzo*, 491 F.2d 215 (2d Cir.), *cert. denied*, 416 U.S. 990 (1974); *United States v. Marion*, 535 F.2d 697 (2d Cir. 1976), it suggested in *dictum* in each case that if the state set forth procedures for the issuance of a search warrant authorizing wiretaps which were more stringent than those set forth in the federal statute, the validity of the wiretaps and orders authorizing those wiretaps would have to satisfy the requirements of the state and federal statutes. *Miller*, 116 F.3d at 660. The Second Circuit further noted that in *United States v. Sotomayor*, 592 F.3d 1219 (2d Cir.), *cert. denied*, 442 U.S. 919 (1979), it stated that the *dicta* in the *Manfredi-Rizzo-Marion* trilogy did not obligate the application in federal court all of the provisions of a state wiretap statute which contained more stringent provisions that Title III, but only those more stringent state statutory requirements which were substantive in the sense that they were "designed to protect an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character." *Miller*, 116 F.3d at 661 (quoting *Sotomayor*, 592 F.2d at 1225). The court rejected the defendant's argument that § 2516(2) mandated application of state law to the state wiretap at issue noting "the dicta in these cases (*Manfredi -Rizzo- Marion-Sotomayor)* has never been applied to exclude

evidence." *Id.* Finally, in rejecting the defendants' argument that a prior state court ruling to suppress certain evidence derived from a state authorized wiretap was not binding on the federal court, the Second Circuit stated, "state court rulings in a criminal trial are not binding on a federal court because the state and national sovereignty are separate and distinct from one another." *Id.* at 663 (internal citation omitted).

The First Circuit in *United States v. Charles,* 213 F.3d 10 (1st Cir. 2000), rejected the argument that § 2516(2) required the application of state law to admissibility questions in federal court of evidence obtained from state-authorized wiretaps. *Id.* at 81-21. The court concluded, in essence, that § 2516(2) did not trump the long standing rule that the test for admissibility of evidence in federal court "is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Id.* at 19 (citing *Elkins v. United States*, 364 U.S. 206, 223-24 (1960)). Although the court did "recognize that several courts have concluded that § 2516(2) may require the application of state law where the state wiretap statute contains standards that are more protective of privacy than the corresponding provisions of the Federal Wiretap Statute," the court noted that in the case before it the state statute did not contain more exacting or stringent requirements than Title III.. *Id.* at 20-21.

Finally, in *United States v. Williams*, 124 F.3d 411 (3d. 1997), *cert. denied*, 522 U.S. 1051 (1998), the Third Circuit held Section 2516(2) did not operate to apply state law in federal court to determine whether to suppress evidence derived from a state authorized wiretap. *Id.* at 427. In this case, the alleged violation of state law involved an illegal disclosure of evidence after it was lawfully intercepted by the state authorized wiretap. The Third Circuit examined 18 U.S.C. § 2518(10), which the court found set out the "exclusive grounds for suppression under Title III." *Id.* The court

held that none of the three grounds set out in § 2518(10) "applies to evidence that is *intercepted lawfully* but that is later *disclosed improperly.*"[2] *Id.* (emphasis added). The *Williams* defendants argued that pursuant to Section 2516(2), which requires an authorization order signed by a state judge must be "in conformity with . . . the applicable State statute," Pennsylvania's law regarding disclosure of wiretap evidence applied resulting in suppression of the evidence. The Third Circuit soundly rejected this argument on the ground that since Section 2518(10) "makes no mention of *federal or state* disclosure violations, we see no basis for holding that this provision authorizes suppression for state, but not federal, disclosure violations." *Id.* at 427 (emphasis is original). The court stated that "[i]t is a general rule that federal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law." *Id.* at 428.

Based upon the decisions of the Eighth, Eleventh, Second, First and Third Circuits in *Padilla-Pena*, *Brazel, Miller, Charles,* and *Williams*, *supra*, I **CONCLUDE** that federal law, not state law, controls the admissibility of the evidence received as the result of the state-authorized wiretaps in this federal court action. The same conclusion was reached by this Court in *United States v. Johnson*, No. 1:06-CR-31, 2007 WL 2220409, * 1 (E.D. Tenn. July 27, 2007).

---

[2] Section 2518(10)(a) states suppression of wiretap evidence may be sought on the following grounds:

**(i)** the communication was unlawfully intercepted;

**(ii)** the order of authorization or approval under which it was intercepted is insufficient on its face; or

**(iii)** the interception was not made in conformity with the order of authorization or approval.

9

Moreover, even assuming *arguendo* that the Sixth Circuit was inclined to follow the *dicta* of the Second Circuit in *Manfredi*, *Rizzo*, *Marion*, and *Sotomayor*, *supra*, that if the state wiretap act under which the intercepts were authorized were more stringent than the federal wiretap statute in a substantive sense which was designed to protect an individual's right of privacy, the order authorizing such wiretaps would have to comply with both the state and federal law, such a situation is not presented here. The relevant provisions of the federal statute, 18 U.S.C. § 2518, and the Tennessee statute, Tenn. Code Ann. § 40-6-304, are virtually identical and no party – particularly none of the Defendants – has cited to any portion of the statute or any Tennessee precedent interpreting Tenn. Code Ann. § 40-6-304 as being more exacting or stringent than the federal statute in a substantive sense.[3]  *See Frierson v. Goetz*, 99 F. App'x 649, 652 (6th Cir. 2004) ("The

---

[3]  Title III, 18 U.S.C. § 2518 states in relevant part:

> (1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
> . . .
> (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

The Tennessee statute, Tenn. Code Ann. § 40-6-304, likewise states in pertinent part:

> (a) Each application for an order authorizing the interception of a wire, oral or electronic communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction in the district where the interception of a wire, oral or electronic communication is to occur, or in any district where jurisdiction exists to prosecute the underlying offense to support an intercept order under § 40-6-305. The application shall state the investigative or law enforcement officer's authority to make the application and shall include the

10

Tennessee Wiretap Law, Tenn. Code Ann. §§ 40-6-30. *et seq.*, parallels the Federal Wiretap Law in prohibiting the unauthorized interception and disclosure of oral communications and in requiring certain procedures to obtain an order.").

## B.     The Necessity Requirement

Lawrence asserts Browne's affidavit in support of the application for the first wiretap – which was authorized on October 5, 2007 – failed to provide a sufficient statement regarding the necessity for a wiretap [Doc. 104 at 3-9].[4]  Cunningham asserts the affidavits in support of the applications for the wiretaps on Kelley's telephones, which are dated February 12, 2008 [Doc. 117-2 & 117-3], fail to show "necessity" for such wiretaps and he requests a Franks hearing with regard to the affidavits [Doc. 108 at 1-2].  Shropshire adopts Cunningham's position [Doc. 117 at 1, 4] with regard to the applications for the wiretaps on Kelley's telephones.  Stiner adopts the arguments of Cunningham and Shropshire [Doc. 118-2 at 1].

### 1.     Standard

The Sixth Circuit has held "[t]he basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520." *United States v. Alfano*, 838 F.2d 158, 161-

---

following information:
. . .
(3) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

[4]  Although Lawrence uses the phrase and all subsequent wiretap warrants when referring to the October 5, 2007 warrant, he makes no specific reference or argument concerning any subsequent warrant.

11

62 (6th Cir. 1988). Title III "was enacted for the purpose of regularizing and controlling the issuance of warrants for wiretaps." *Id.* at 161. In pertinent part, Title III "requires a determination that other means of obtaining information, such as physical surveillance, use of informants, and other investigative techniques, would be unsuccessful." *Id.* at 163 (citing 18 U.S.C. § 2518(1)(c)). This requirement "is referred to as the 'necessity requirement.'" *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (citing 18 U.S.C. § 2518(1)(c)). "The needs statement provision was placed in the statute to ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Alfano*, 838 F.2d at 163 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974)). "Thus, wiretaps are not to be used thoughtlessly or in a dragnet fashion . . .. what is needed is to show that wiretaps are not being 'routinely employed as the initial step in criminal investigation.' *Id.* (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)).

The necessity requirement also "protects against the impermissible use of a wiretap as the 'initial step in [a] criminal investigation.'" *Rice*, 478 F.3d at 710 (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)). There is no requirement, however, that the "government . . . prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163 (citing *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir. 1985)). Rather, as the Sixth Circuit has stated:

> All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate. While the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried, a purely conclusory affidavit unrelated to the instant case and not showing any factual

> relations to the circumstances at hand would be . . . inadequate compliance with the statute.

*Rice*, 478 F.3d at 710 (internal and external citations omitted). The Sixth Circuit has stated its belief that the "necessity requirement" in Title III "do[es] not require proof of the absolute impossibility of all other means. Instead, a reasonable statement of the consideration or use of other investigative means is adequate . . . ." *Alfano*, 838 F.2d at 164.

The legislative history for the statute also confirms this view:

> Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.

S. Rep. No. 90-1097, at 79 (1968), *reprinted in* 1968 U.S.C.C.A.N. at 2112, 2190. Congress also noted that "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely," while emphasizing that "[w]hat the provision envisions is that the [government's] showing [of necessity] be tested in a practical and common sense fashion." *Id.*

"Because the necessity requirement is a component of Title III, and because suppression is the appropriate remedy for a violation under Title III, where a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must be suppressed." *Rice*, 478 F.3d at 710. However, "a wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption." *United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995). *See also United States v. Feldman*, 606 F.2d 673, 679 n. 11 (6th Cir. 1979) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression.").

## 2.    Applications

### a.    The October 5, 2007 Application

Lawrence asserts the October 5, 2007 application does not meet the "necessity requirement" of Title III because the affidavit states in a conclusory manner that interception is the only investigative technique that will succeed [Doc. 104 at 3-5]. He also asserts the "necessity requirement" is not satisfied because the application shows that other investigative techniques have been successful in the absence of a wiretap [*id.* at 5-9].

Contrary to Lawrence's contentions, sufficient information is set forth in Browne's affidavit in support of the October 5, 2007 application to comply with the "necessity requirement" of Title III. 18 U.S.C. § 2518(1)(c) and (3)(c). Lawrence has not satisfied his burden of overcoming the presumption that the wiretap authorization order signed by Judge Steelman on October 5, 2007 is proper. As Browne's affidavit shows that the investigators did give serious consideration to non-wiretap investigative techniques prior to applying for the authority to wiretap and informed the state court of the basis for the investigator's belief that such non-wiretap investigative techniques either had been or would likely be inadequate, the affidavit satisfies the "necessity requirement."

In his detailed 26-page affidavit supporting the application for the October 5, 2007 state court order authorizing the wiretap on Tina Brown's/Lewis's telephone, Browne sets out his qualifications as a law enforcement officer and affiant, the grounds for seeking the wiretap authorization, as well as the fact that no prior applications for wiretaps had been sought related to any of the subjects known to have been using the target telephone [Doc. 157-2 at 2-5]. Browne's affidavit then detailed the background of the drug trafficking conspiracy under investigation, including the information already known to law enforcement as the result of the ongoing

14

investigation into the drug trafficking conspiracy [*id.* at 5-8]. Browne's affidavit states he and other

investigators are "seeking communications intercept authority because they believe that it is the only

investigative technique available that will allow them to meet their investigative goals . . . normal

investigative procedures have been employed but have failed, or are reasonably unlikely to succeed

if attempted, or are too dangerous to employ." [*Id.* at 8]. Browne states his belief that the only

means of penetrating the drug trafficking organization/conspiracy and satisfying the investigative

goals of law enforcement is by means of wiretaps, particularly the wiretap sought in his application

[*id.* at 8].

Browne's affidavit then states there is probable cause to believe the wiretaps will reveal:

> (1) the nature, extent and method of operation by which the Target
> Subjects and others as yet unknown, conduct their illicit drug
> trafficking business; (2) the identities and roles of accomplices, aiders
> and abettors, co-conspirators, and participants in their illegal
> activities; (3) information regarding the receipt and distribution of
> contraband and money involved in those illegal activities; (4) the
> identification and location of items used in furtherance of those
> illegal activities; (5) the identification and location of records relating
> to those illegal activities; (6) information regarding the locations and
> sources of resources used to finance those illegal activities; and (7)
> information regarding the location and disposition of the proceeds of
> those illegal activities. In addition, the intercepted wire
> communications are expected to constitute admissible evidence of the
> commission of the above-described offenses.

[*Id.* at 9]. Browne's affidavit continues by identifying the targets/subjects whose communications

are expected to be intercepted by the wiretap [*id.* at 9-11], detailing the information known to law

enforcement which led them to believe, *i.e.*, gives rise to probable cause, that a drug trafficking

conspiracy exists [*id.* at 11-15], and identifying the information known to law enforcement that led

them to believe the target telephone was being used for communications in furtherance of the drug

trafficking conspiracy, including information from confidential sources/informants, pen registers,

and toll analysis of the target telephone [*id.* at 16-17].

Browne then engages in an explicit discussion of alternative techniques of investigation, namely: (1) physical surveillance; (2) confidential sources; (3) infiltration by undercover officers; (4) general and grand jury questioning, without grants of immunity; (5) search warrants; and (6) review/analysis of telephone records, noting that each of the aforementioned methods had either been tried and failed, appeared unlikely to succeed, or was too dangerous to use [*id.* at 18-23]. Browne first discusses physical surveillance, noting that it had been tried at Lewis's residence(s), but the suspect residences were in areas that were particularly difficult to conduct surveillance because one suspected residence could only be accessed through a narrow alleyway and the other residence was situated such that it could only be seen from directly in front of the residence [*id.* at 18-19]. Browne also noted that surveillance was not a substitute for wiretaps because officers who are conducting surveillance are rarely able to lawfully overhear conversations and surveillance rarely reveals the contents of packages, the details of transactions that take place inside a vehicle or structure, and other critical details relevant to the target goals of the investigation [*id.* at 19].

Browne also provided a detailed discussion of the information received from confidential informants/sources [*id.* at 19-20], but noted that one confidential informant/source knew Lewis, but not his supplier and that another confidential informant/source felt it had become known he was providing information concerning the drug trafficking conspiracy and had gone into hiding [*id.* at 19]. Browne further noted that based upon his law enforcement training and experience, even if he were able to obtain a confidential informant to infiltrate the drug trafficking conspiracy/organization, such informant/source would not be able to obtain information concerning the extent of the organization/conspiracy [*id.*].

Browne further noted that use of undercover agents to infiltrate the organization/conspiracy was not a valid investigative technique for much the same reason the use of confidential informants/sources was not a viable method of investigation in this instance [*id.*]. He additionally noted that undercover officers had not been successful in infiltrating the organization/conspiracy in any manner that was helpful to the investigation, and he noted that even if an undercover officer were able to infiltrate the organization/conspiracy, such infiltration would not fulfill the goals of the investigation [*id.* at 21]. He opined an undercover infiltrating officer would be unable to identify all participants in the drug trafficking, all locations where drugs were stored, and all assets acquired by Lewis as part of the conspiracy [*id.*].

Browne also stated that general questioning of co-conspirators and associates of Lewis had been considered, but not attempted because of concerns such general questioning would compromise the investigation when the individuals who were questioned communicated with the targets of the investigation, resulting in the destruction or concealment of documents, contraband, or other evidence [*id.* at 21]. Browne stated his belief that grand jury questioning would likewise be unsuccessful because individuals would appear before a grand jury, deny their involvement, and alert other participants, again resulting in the destruction/concealment of evidence. Browne stated that numerous individuals had been questioned and had provided valuable information, but that none of the information reached the level of satisfying the goals of the investigation [*id.* at 20-21].

In addition, Browne noted that search warrants had been considered and used in the past in an unsuccessful attempt to dismantle the drug trafficking organization [*id.* at 22]. Browne stated the use of search warrants had met with only limited success and that search warrants would not provide sufficient evidence on the full scope of the conspiracy, the identity of all co-conspirators, and of all

locations where drugs were stored [*id.*].

Browne finally noted that although telephone toll records had and would continue to provide useful information to the investigation, such data could not be expected to provide information concerning the full scope of the investigation, because telephones were often subscribed under an alias or in the names of friends and family members [*id.* at 22-23].  Browne also noted that toll records do not provide any information on the content of telephone conversations [*id.* at 22].  Likewise, Browne stated that pen registers also provide limited, but not specific, information [*id.* at 23].  Finally, Browne noted that cell site analysis of cellular telephone conversations had been used with limited results due to the size of Chattanooga combined with the number of cell phone towers located in Hamilton County [*id.*].

### b.    The February 12/13 Applications

Cunningham asserts the "necessity requirement" under Title III was not satisfied because:

> an independent and separate consideration/determination was never made in regard to the necessity of the Kelley wiretaps; that in several instances traditional methods were not utilized or attempted in regard to Kelley; and that when traditional methods of investigation were utilized they were highly successful and, therefore, law enforcement representations as to the "necessity" of a wiretap were false and, at the least recklessly made . . . From the four corners of the affidavit/application, it is clear that the government's burden of necessity was never shown.

[Doc. 108 at 7-8].  Shropshire, Stiner and Kelley adopted Cunningham's arguments and position [Doc. 117 at 4, 118-2 at 1-2 & 127 at 1].

Contrary to the contentions of Cunningham, Kelley, Shropshire and Stiner, there is sufficient information set forth in Watters' affidavits in support of the February 12/13, 2008 applications to comply with the "necessity requirements" of Title III.  18 U.S.C. § 2518(1)(c) and (3)(c).  The

18

wiretap authorization orders signed by Judge Steelman on February 13, 2008, are presumed proper and Cunningham, Kelley, Shropshire and Stiner have not satisfied their burden of overcoming this presumption. Watters' affidavits satisfy the "necessity requirements" of Title III because they show that the investigations did give serious consideration to the non-wiretap investigative techniques prior to applying for the authority to wiretap and informed the state court of the basis for the investigation's belief that such non-wiretap investigative techniques either had been or would likely be inadequate.

In his lengthy and highly detailed affidavits supporting the applications for the February 12/13, 2008 state court orders authorizing the wiretaps on Kelley's telephones, Watters identified his qualifications as a law enforcement officer and affiant [Doc. 117-2 at 3-5, 117-3 at 3-4], the history of the prior applications for wiretaps made to the state court [Doc. 117-2 at 6, 117-3 at 6], and the background of the drug trafficking conspiracy under investigation [Doc. 117-2 at 7-25, 117-3 at 7-26]. Watters states he and other investigators are "seeking communications intercept authority because they believe it is the only investigative technique that will allow them to meet their investigative goals . . . normal investigative procedures have been employed but have failed, or are reasonably unlikely to succeed if attempted, or are too dangerous to employ." [Doc. 117-2 at 25, 117-3 at 42]. The affidavit also sets forth seven specific investigative goals the wiretaps are designed to further as well as identifying targets/suspects whose communications are expected to be intercepted [*id.*].

The affidavits detail the information known to the police as the result of their prior investigations which led the police to reasonably believe, *i.e.*, have probable cause to believe, of the existence of a drug conspiracy and that telephones/telephonic communications are being used in

furtherance of that drug trafficking conspiracy [Doc. 117-2 at 27, 117-3 at 27-30]. Watters specifically details the information which led police to believe the target telephones – Kelley's telephones – were being used for communications in furtherance of the drug trafficking conspiracy [117-2 at 30-40, 117-3 at 30-42].

Watters discussed alternative techniques of investigation such as: (1) physical surveillance; (2) confidential sources; (3) infiltration by undercover officers; (4) general and grand jury questioning, with or without grants of immunity; (5) search warrants, and (6) review/analysis of telephone records, noting that each of the aforementioned methods had either been tried and failed, appeared unlikely to succeed, or was too dangerous to use [Doc. 117-2 at 41-46, 117-3 at 42]. Specifically, Watters opined physical surveillance alone was insufficient and noted physical surveillance had been attempted with regard to Kelley and that, based on the agents training and experience, prolonged surveillance of Kelley's residence would reveal the existence and scope of the investigation [Doc. 117-2 at 42, 117-3 at 42-43]. Watters' discussion of the alternative technique of physical surveillance demonstrates careful consideration of it as an alternative to wiretaps and sets forth reasons why physical surveillance alone would not be a successful or viable alternative for the requested wiretaps.

Watters also provided a detailed discussion of the information the investigation had received from confidential sources/informants and explained that although the information received from confidential sources had been helpful to the investigation, it had not been able to provide specific information as to some of the target goals of the investigation into the drug trafficking conspiracy [Doc. 117-2 at 43, 117-3 at 43-44]. Again, the discussion set forth by Watters revealed careful consideration of this alternative technique and sets forth reasons, based upon the information

20

actually received from confidential sources/informants, why this alternative investigative technique was insufficient to satisfy the target goals of the investigation [*id.*].

Watters further provided a detailed discussion of why the alternative techniques of infiltration by undercover officers and grand jury and/or general questioning had been considered but not used in the investigation [Doc. 117-2 at 44-45, 117-3 at 44-45]. Finally, with regard to search warrants and the review and/or analysis of telephone records, Watters again notes that both of these alternative techniques had been tried in the past but has provided only limited success [Doc. 117-2 at 45-46, 117-3 at 46]. Watters further articulated reasons why these techniques were insufficient to meet the target goals of the investigation [*id.*].

### 3. Necessity Requirement Satisfied

Browne's affidavit in support of the October 5, 2007 application and Watters' affidavits in support of the two February 12/13, 2008 applications adequately addressed investigative alternatives and the belief that the alternatives would not be adequate in satisfaction of the necessity requirement of Title III. *See Alfano*, 838 F.2d at 163-64; *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985). The affidavits show investigative alternatives were considered and rejected because the investigators believed alternative investigative techniques would not be adequate. The affidavits also show that the investigators did not seek authorization for the wiretaps at the outset of the investigation into the drug trafficking conspiracy/organization, but instead tried alternative investigative methods and found them unsuccessful to satisfy the target goals of the investigation prior to seeking state court authorization for the wiretaps.

Contrary to the allegations of Cunningham, Kelley, Shropshire and Stiner, the affidavits were not mere boilerplate with regard to the consideration of alternative and less intrusive investigative

21

techniques than wiretapping. In those situations where alternative investigative techniques were used – particularly, physical surveillance and the use of confidential informants – Browne and Watters set forth the results of such techniques. The results supported their conclusions, as experienced law enforcement officers, that such alternative investigative techniques were not, and would not be, fully adequate. With regard to the remaining alternative investigative techniques, especially those investigative techniques that were considered but rejected because they were deemed likely to be unsuccessful and/or dangerous to the investigators/investigation, both Browne and Watters set forth reasons, again based upon their law enforcement experience, why resort to such alternative investigative techniques would not be adequate.

Thus, I **FIND** the affidavits and applications satisfy the "necessity requirement" of Title III. *See, e.g., United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) ("In endeavoring to secure a wiretap warrant, the government need not prove the impossibility of other means of obtaining information."); *United States v. Minton*, 153 F.3d 891, 895 (8th Cir. 1998) (affidavit which described why traditional investigative techniques do not normally prove successful when targeting drug conspiracies was sufficient, even though "some of these assertions might appear boilerplate" given that "drug investigations suffer from common investigatory problems."); *United States v. London*, 66 F.3d 1127, 1237 (1st Cir. 1995) (necessity provision interpreted to mean that government must demonstrate "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls."); *Lambert*, 771 F.2d at 91 (government's obligation under § 2518(1)(c) satisfied by explanation in affidavits that other investigative measures could not reasonably be used because of subject's extreme suspicion that his activities were being monitored, and the fact that alternative

investigative procedures, such as directly questioning the subject and his associates, would likely

alert the subjects to the presence and scope of the investigation).

## C. Probable Cause

In *Alfano,* the Sixth Circuit set forth the general standard for determining probable cause

under Title III:

> [T]here is no specific formula that must be met for a warrant, and []
> evidence must be judged on the totality of the circumstances and in
> a reasonable and common sense manner. *Illinois v. Gates,* 462 U.S.
> 213, 238 (1983). Under this standard, the question that must be
> decided in issuing a warrant is whether there is probable cause to
> believe that evidence of a crime will be uncovered.

838 F.2d at 161-62. Thus, probable cause is present for the issuance of a wiretap order if the totality

of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of

a crime. *Id.*; *United States v. Giacalone*, 853 F.2d 470, 478 (6th Cir.), *cert. denied*, 488 U.S. 910

(1988); *United States v. LaPuma*, No. 88-2237, 1989 WL 125242 * 2 (6th Cir. Oct. 23, 1989).

Generally, the validity of an electronic surveillance order is reviewed with great deference to the

determinations of the issuing judge. *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir.2000).

Giving the required due deference to the issuing judge, I **FIND** the affidavits provide ample

probable cause for the orders authorizing the wiretaps.

## D. Franks Hearing

The sufficiency of a previously issued and executed electronic surveillance order is analyzed

under the procedures outlined in *Franks v. Delaware*, 438 U.S. 154 (1978), including the procedure

commonly referred to as a Franks hearing. *Stewart*, 306 F.3d at 304-06. A Franks hearing is an

evidentiary hearing during which defendants are allowed to present evidence concerning the veracity

of the challenged statements in the search warrant affidavit. *United States v. Keszthelyi,* 308 F.3d

23

557, 566-68 (6th Cir. 2002); *United States v. Jenkins*, 728 F.2d 396, 397 (6th Cir. 1984). "In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks,* 438 U.S. at 155-56; *see also Keszthelyi,* 308 F.3d at 566.

In order to obtain a Franks hearing, the defendant must meet a two-pronged test. First, a defendant must make a substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false. *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001*); United States v. Hill*, 142 F.3d 305, 310 (6th Cir. 1998). "[T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Franks*, 438 U.S. 154, 171. Second, the court must find that the challenged statements are necessary to a finding of probable cause. *Id.* In *Franks*, the Court emphasized that only the affiant's deliberate falsity or reckless disregard for the truth may be challenged. *Id.* at 171.[5]

The Sixth Circuit has elaborated upon the *Franks* standard as follows:

> A defendant who challenges the veracity of statements made in an

---

[5] *Franks* challenges may also be made on the basis of intentional or reckless omissions of fact from the warrant affidavit where such omissions, if known to the issuing magistrate, would dispel probable cause. *Keszthelyi,* 308 F.3d at 566; *United States v. Atkins*, 107 F.3d 1213, 1217 (6th Cir. 1997). In the case at bar, there is no allegation that information was excluded with the intention to mislead.

24

affidavit that form the basis for a warrant has a heavy burden. His allegations must be more than conclusory. He must point to specific false statements that he claims were made intentionally or with reckless disregard for the truth. He must accompany his allegations with an offer of proof. Moreover, he should also provide supporting affidavits or explain their absence. If he meets these requirements, then the question becomes whether, absent the challenged statements, there remains sufficient content in the affidavit to support a finding of probable cause.

*United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citations omitted).

Only if a defendant shows the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in his affidavit, is the false material set aside and the affidavit reviewed on the basis of the remaining content for sufficiency. *See Franks*, 438 U.S. at 155-56. Allegations of negligence or innocent mistake are insufficient to show deliberate falsity of reckless disregard. *Id.* at 171 (affiant himself, not non-governmental informant, must have intentionally or recklessly made false statements); *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993) (same); *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003) (same); *Giacalone*, 853 F.2d at 477 ("Under *Franks*, suppression is required only when the *affiant* deliberately lied or testified in reckless disregard of the truth."); *United States v. Moran*, 349 F. Supp. 2d 425, 455 (N.D.N.Y. 2005) (a defendant is entitled to a *Franks* hearing only when he meets preliminary burden by challenging the truthfulness of statements made by the affiant, not the truthfulness of a non-governmental informant). "[I]f the warrant affiant had no reason to believe the information was false, there was no violation of the Fourth Amendment." *Franks* at 172 n. 8. *See also Rice*, 478 F.3d 711.[6] "[T]he Franks' analysis is applicable to alleged misrepresentations

---

[6] The Sixth Circuit recently held that the *Leon* good faith exception does not apply to warrants improperly issued under Title III. *Rice,* 478 F.3d 704.

pertaining to the necessity requirement." *United States v. Flores*, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, * 32 (N.D.Ga. Sept. 27, 2007) (quoting 18 U.S.C. § 2518(c)).

Cunningham requests a *Franks* hearing, in the alternative, "in order to demonstrate that material misrepresentations were made either intentionally or with reckless disregard for the truth in [Watters'] affidavits and that had such misrepresentations not been made, the requirements of probable cause and 'necessity' would not have been met . . . ." [Doc. 108 at 2]. Cunningham alleges Watters' affidavits are internally inconsistent with respect to the physical surveillance of Kelley and that Kelley was vulnerable to such surveillance [*id.* at 8-10]. He alleges Watters made material misrepresentations when he alleged:

> that Kelley, Akins, Lewis and their associates have extensive experience trafficking drugs and have numerous arrests for drug violations. . . . based on available records and counsel's knowledge, Michael Kelley does not have a previous drug trafficking offense on his record and has only one previous arrest allegedly concerning marijuana.

[*Id.* at 9]. Cunningham thus contends that Watters' assertion of "numerous arrests for drug law violations" is a misrepresentation of the applicable facts as to Kelley. Cunningham also asserts Watters' affidavit:

> states that numerous individuals have been questioned about the drug trafficking activities of Lewis - no mention is made of Michael Kelley. Watters goes on to state, in regard to Lewis, that no valuable information had been gained from questioning certain individuals, "None of the information received has reached the level of identifying Lewis' source . . ." Clearly, this is a misrepresentation/misstatement since other portions of the affidavit make clear that Lewis' source is DeMarcus Akins, from Atlanta, Georgia, and had been Michael Briddy. Watters goes on to state that previous information had not identified "the locations used to stash drugs and assets." However, this too is misrepresentation/misstatement in that information previously received had shown that large drug transactions took place at the

residence of Mr. Akins' girlfriend, located on Sumter Avenue in Chattanooga, Tennessee. Furthermore, other drug transactions had been observed to take place in Akins' home in Atlanta, Georgia.

[*Id.* at 13].

Shropshire also requests a Franks hearing, stating:

in reviewing the applications of all the wiretaps in this case, it is quite obvious that Agent Watters made numerous misrepresentations or misstatements when he lifted the language from previous applications and present it to Judge Steelman as accurately portraying the investigation as it applied to Kelley. The statements made were misleading or recklessly made, and the application cannot stand when these material misrepresentations are deleted from the application.

[Doc. 117 at 13-14]. Shropshire, however, neither cites nor identifies any specific misrepresentation or misstatement made by Watters in his affidavits. Likewise, Stiner requests a Franks hearing asserting that Watters made material misrepresentations in his affidavits, but does not identify any alleged misrepresentation or misstatement [Doc. 118-1 at 1]. Kelley also requests a *Franks* hearing without specifying any alleged misrepresentations, although he does appear to incorporate Cunningham's position [Doc. 127].

Based upon the pleadings identified above, unless Cunningham has made the required two prong showing for a Franks hearing, none of the Defendants have done so. While Cunningham has identified information which he claims is false, he has made no offer of proof establishing the falsity of any statement in Watters' affidavits nor explained his failure to do so. Even if the Court were to assume *arguendo* that the alleged falsity of the identified statements is shown based upon internal inconsistencies within the four corners of Watters' affidavits as argued by Cunningham, Cunningham has still not shown that if the aforementioned statements were stricken from Watters' affidavits, the affidavits would lack the required necessity or probable cause for the orders

authoring the wiretaps. Accordingly, the Defendants have not met their threshold showing for a Franks hearing.

I **FIND** Defendants have failed to make the required showing for a Franks hearing on the veracity of Watters' affidavits. Based upon the Defendants' failure to meet the required showing, no Franks hearing was held.

## IV.    Conclusion

For the reasons stated herein, I **RECOMMEND** that Defendants' motions to suppress [Doc. 103, 108, 116, 118 & 127] be **DENIED**.[7]

s/Susan K. Lee
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[7] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

28